NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**CHERYL JEAN METZ,**
*Petitioner*

**v.**

**OFFICE OF PERSONNEL MANAGEMENT,**
*Respondent*

_____

2023-1873

_____

Petition for review of the Merit Systems Protection Board in No. DC-0831-22-0046-I-2.

_____

Decided: March 12, 2025

_____

STEPHEN B. PERSHING, Kalijarvi, Chuzi, Newman & Fitch, PC, Washington, DC, argued for petitioner. Also represented by GEORGE CHUZI.

KELLY GEDDES, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. MCCARTHY, VIJAYA SURAMPUDI.

_____

Before LOURIE, DYK, and PROST, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* PROST.

Opinion dissenting-in-part filed by *Circuit Judge* DYK.

PROST, *Circuit Judge.*

Mrs. Cheryl Metz applied for survivor annuity benefits after her husband's death in 2006. The Office of Personnel Management ("OPM") denied her application. Mrs. Metz appealed the denial of her application to the Merit Systems Protection Board ("MSPB"). The MSPB administrative judge ("AJ") affirmed OPM's denial of benefits, and that decision became final on March 16, 2023. *Metz v. OPM*, No. DC-0831-22-0046-I-2, 2023 WL 1949093 (M.S.P.B. Feb. 9, 2023) ("*Decision*"), J.A. 1–34.[1] Mrs. Metz appeals, and we affirm.

Under the Civil Service Retirement Spouse Equity Act of 1984, if a retired federal employee is survived by a widow or widower, that spouse is, by default, entitled to receive survivor annuity benefits. *See* 5 U.S.C. § 8341(b)(1). That default entitlement, however, may be waived. For example, the employee may elect to receive a higher annuity during his or her lifetime in lieu of the survivor benefit for his or her spouse but only if both parties "jointly waive the spouse's right to a survivor annuity in a written election filed with [OPM] at the time that the employee . . . retires." 5 U.S.C. § 8339(j)(1). This case involves such a waiver that was notarized and submitted to OPM. Mrs. Metz argues, however, that her signature on that waiver form was forged or, alternatively, that she was mentally incompetent at the time that she signed the waiver. The AJ found that Mrs. Metz had not met her burden under either theory, and

---

[1] Because the Westlaw version of the opinion is not paginated, we have used the Joint Appendix pagination for the citations to this *Decision*.

thus, the notarized waiver form was a proper basis to deny Mrs. Metz survivor annuity benefits. We conclude that substantial evidence supports the AJ's findings under both theories.

BACKGROUND

I

Richard F. Metz and Mrs. Metz married in 1963. Mr. Metz worked in federal civil service until April 30, 1988, when he retired. About a month before Mr. Metz's retirement, a letter, appearing to be sent by Mrs. Metz to OPM's retirement division, inquired about the possible loss of medical insurance if Mr. Metz passed away. *See Decision*, at 16–17 (describing OPM Exhibit 1 as March 1988 letter). As relevant here, the letter states:

> My husband is contemplating early retirement from the Federal Government and will continue his medical insurance as a retiree. *He is however, waiving my survivor benefits under his retirement and opting for increased life insurance.* My question is, if my husband precedes me, we are advised that I may be left without proper Medical insurance and not able to carry his coverage foreword since the survivor benefit option will be waived.

*Id.* at 17 (emphasis added) (quoting March 1988 letter). The letter was written from Mrs. Metz's perspective and contained signatures bearing her name. *See id.* Shortly thereafter, in April 1988, the form electing to waive survivor annuity benefits was completed. *See* J.A. 269. Mr. Metz then began receiving an annuity from the Civil Service Retirement System ("CSRS") that was not reduced to account for a survivor annuity. In January 2006, Mrs. Metz alleges that she discovered the March 1988 letter and confronted her husband alleging it was forged.

In November 2006, Mr. Metz passed away while still married to Mrs. Metz. In December 2006, Mrs. Metz

completed an application for survivor annuity benefits. Between 2006 and 2021, Mrs. Metz's application remained pending.[2]

In 2021, Mrs. Metz and her son Dennis Metz were cleaning out files at home, when they found two documents relevant here: the first, the April 1988 form waiving Mrs. Metz's survivor annuity benefits and the second, the 2006 application for benefits. In October 2021, Mrs. Metz appealed to the MSPB, asserting that OPM had never processed her 2006 application and that she was entitled to the survivor annuity benefit. The MSPB AJ ordered OPM to issue its decision on Mrs. Metz's application, and after some delay, OPM issued its final decision on June 23, 2022, denying Mrs. Metz's application. *See Decision*, at 3. Specifically, OPM based its denial, at least in part, on findings from OPM's Fraud Department, which stated:

> When Richard Metz retired 04/30/1988 he completed the spousal consent to survivor benefits which was notarized and signed properly. Cheryl Metz signed the document in front of a Notary electing no survivor benefits.

> We matched her signature against documents from her retirement case file, A13950250. The Fraud Branch has reviewed the signatures and they are a match. Cheryl Metz is not eligible for a survivor annuity benefit as a spouse of Richard Metz.

*Id.* (quoting J.A. 48).

## II

Mrs. Metz appealed the denial of benefits to the MSPB, arguing that the signature on the waiver form was not hers

---

[2] The government alleges that the 15-year delay was the result of an inadvertent processing error. Appellee's Br. 3.

and instead was forged, and even if it was not forged, that she did not have the mental capacity to sign a document at that time. Mrs. Metz presented four witnesses in support of her appeal: (1) Dennis Metz testified that Mr. Metz had made previous attempts to forge his signature and that the signature on the waiver form was not his mother's. (2) Ms. Eisenberg, a handwriting expert, opined that Mrs. Metz "probably" did not write the signature in question on the waiver form. J.A. 56. (3) Dr. Merikangas, an expert in neurology and psychology, reviewed Mrs. Metz medical records from the relevant period (the 1980s) and concluded that "to a reasonable degree of certainty Mrs. Metz was not competent to execute a contract in April of 1988." J.A. 218. And (4) Mrs. Metz herself testified to the factual history of her appeal, including testimony that she did not sign the waiver form, her medical condition in the 1980s, and her relationship with Mr. Metz.

The AJ reviewed the expert reports and held a Zoom hearing where the four witnesses presented their testimony. With respect to Dennis Metz, the AJ found that he had an "inherent bias" in the outcome of a favorable determination and that his testimony was only "loosely circumstantial to the material issues." *Decision*, at 7. With respect to Ms. Eisenberg, the AJ made the following credibility determinations:

> While Ms. Eisenberg has impressive credentials, I did not find her to be an influential witness. For an expert with her years of experience, I expected her to be more knowledgeable of the material facts to the appellant's situation. I found Ms. Eisenberg to be exceptionally bothered during OPM's cross examination and when I questioned her conclusions, as was apparent through her body language, voice tone, and looks of frustration. Additionally, parts of Ms. Eisenberg's testimony and opinions ran directly counter to that of the appellant's other expert, Dr. Merikangas . . . . This meant I had to

discredit one expert to a degree to find the other one credible or find both not persuasive. The evidence led me to the latter.

*Id.* As to Dr. Merikangas, the AJ found that he was not "well enough versed in all the important facts" and that his testimony "contradicted Ms. Eisenberg's opinion." *Id.* at 8. As to Mrs. Metz, the AJ noted that at times she "became audibly and [visibly] frustrated and struck an aggressive and dismissive tone." *Id.* This, coupled with what the AJ found to be a "suspicious . . . number of times the appellant looked away from the camera/screen and seemingly focused her attention on those in the room with her," led the AJ to conclude that her testimony "was not convincing enough to meet her burden of proof." *Id.* at 8–9. In the end, the AJ concluded that Mrs. Metz had failed to prove by preponderant evidence that her signature was forged or that she was mentally incompetent at the time of signing.

### III

Also relevant to this appeal is the AJ's sanction against Mrs. Metz.[3] During the Zoom hearing, the AJ asked a clarifying question about Mrs. Metz's medical insurance. Before Mrs. Metz could answer, her attorney responded instead. *See* J.A. 433–35. The AJ determined that the attorney's response amounted to prejudicial attorney coaching and "[drew] an inference adverse to [Mrs. Metz] concerning her hearing testimony" regarding the exhibit that she was then testifying about—the March 1988 letter. *See* J.A. 467.

---

[3]    Sanctions were also issued against OPM during the MSPB proceedings, which included an adverse inference on multiple interrogatories and a prohibition on OPM introducing additional evidence for failure to follow MSPB regulations and the AJ's orders. *Decision*, at 5.

The AJ's initial decision became final on March 16, 2023. Mrs. Metz timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

### DISCUSSION

We must affirm the MSPB's decision unless the "agency action, findings, or conclusions [are] found to be—(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McIntosh v. Dep't of Def.*, 53 F.4th 630, 638 (Fed. Cir. 2022) (cleaned up). "The petitioner bears the burden of establishing reversible error." *Id.* "[T]he Board's credibility determinations are 'virtually unreviewable on appeal.'" *Briley v. Nat'l Archives & Recs. Admin.*, 236 F.3d 1373, 1377 (Fed. Cir. 2001) (quoting *Rogers v. Dep't of Def. Dependents Sch.*, 814 F.2d 1549, 1554 (Fed. Cir. 1987)).

As briefly explained above, "[t]he Civil Service Retirement Spouse Equity Act of 1984 was enacted to provide spouses of retired CSRS employees with a default entitlement to a survivor annuity," *Decision*, at 9, "unless the right to a survivor annuity was waived under . . . section 8339(j)(1)," 5 U.S.C. § 8341(b)(1). The employee and spouse may "jointly waive the spouse's right to a survivor annuity in a written election filed with [OPM] at the time that the employee . . . retires." 5 U.S.C. § 8339(j)(1). The waiver permits the employee to receive a higher annuity during his or her lifetime in lieu of the survivor benefit for his or her spouse. "Such written waiver is valid absent fraud, duress, or mental incompetence . . . ." *Braza v. OPM*, 598 F.3d 1315, 1317 (Fed. Cir. 2010) (en banc).

It is undisputed here that a written waiver was signed, notarized, and submitted to OPM, electing a higher

annuity during Mr. Metz's life and waiving a survivor annuity benefit for Mrs. Metz.  It is also undisputed that Mr. Metz received the higher annuity payments during his lifetime.  Rather, the dispute here is whether Mrs. Metz's signature on the waiver form was the result of fraud (e.g., forged) or mental incompetence as she alleges.  Mrs. Metz further argues that the AJ abused his discretion by drawing an adverse inference with respect to the March 1988 letter.  We address each argument in turn.

I

Mrs. Metz argues that Mr. Metz forged her signature on the form waiving survivor annuity benefits.  The AJ concluded that Mrs. Metz had not met her burden to show by a preponderance of the evidence that her signature was forged.  We conclude that the MSPB's decision was supported by substantial evidence and thus affirm.

Mrs. Metz presented the following evidence in support of the alleged forgery: (1) her testimony that she did not sign the wavier form; (2) her testimony that she did not see the waiver form until 2021; (3) her testimony that Mr. Metz forged her signature on the March 1988 letter; (4) Dennis Metz's testimony that Mr. Metz had once tried to forge his signature; (5) Dennis Metz's testimony that Mrs. Metz screamed when she found the waiver form and told him that it was "not the first time" Mr. Metz had forged her signature; (6) Ms. Eisenberg's testimony that Mrs. Metz "probably" did not sign the waiver; and (7) Ms. Eisenberg's testimony that a "common author" had signed nine other documents with Mrs. Metz's signature. Appellant's Br. 34.  Mrs. Metz alleges there is no contradictory evidence.  That is not accurate.

First, and most notably, Mrs. Metz's signature on the waiver form was corroborated by a notary.  The notarized form contained a seal and signature from the State of Maryland, and thus the AJ looked to the Maryland State Government Code § 18-209, which states that a notarized

signature is prima facie evidence that "the signature is genuine." *See Decision*, at 14–15. Indeed, Mrs. Metz agrees that "the notarization of a signature creates a strong but rebuttable presumption of validity." Appellant's Br. 33 (quoting *Ford v. OPM*, No. DC-0831-16-0647-I-1, 2022 WL 7019134, at *2 (M.S.P.B. Oct. 11, 2022)). The AJ found that she had not overcome this presumption. Mrs. Metz and her son Dennis Metz attempted to discredit the notary Mr. Ridgell by alleging that they never met him and that he was the owner of a bar that Mr. Metz frequented. But, as the AJ found, whether Dennis Metz ever met Mr. Ridgell and whether Mr. Ridgell owned a bar is irrelevant. This merely left Mrs. Metz's uncorroborated statement that she never met Mr. Ridgell and Ms. Eisenberg's testimony that she places "no value" on notarizations. J.A. 362. But the AJ found that "putting this typecasted view on all notarizations [was] misguided." *Decision*, at 15. Indeed, such a view would fly in the face of the presumption that a notarized signature is valid.

Second, the notarization was not the only evidence that Mrs. Metz signed the waiver form. OPM's Fraud Department also "matched [Mrs. Metz's] signature [on the waiver form] against documents from her retirement case file, A13950250. The Fraud Branch has reviewed the signatures and they are a match." *Decision*, at 3 (quoting J.A. 48); *see also id.* at 13. Mrs. Metz provides no response as to why the Fraud Branch's conclusion is not credible.

Third, OPM presented contemporaneous evidence (the March 1998 letter) that Mrs. Metz was aware that her husband intended to waive the survivor benefits. *See Decision*, at 16–17 (stating "My husband is . . . waiving my survivor benefits under his retirement and opting for increased life insurance."). Mrs. Metz claims that this letter was also forged by her husband. But, as the AJ found, Mrs. Metz provided no reason or motive for why Mr. Metz would have done so: "It would have made more sense for Mr. Metz to send the [March 1988] letter under his name and

signature, as he was the primary holder of the insurance." *Id.* at 17. Indeed, the AJ found that Mrs. Metz's and Dennis Metz's testimony cut against the March 1998 letter as a forgery because according to their claims, "Mr. Metz made selfish unilateral decisions that benefited him and no one else." *Id.* at 18. The AJ did not find Mrs. Metz's forgery allegations about this letter credible. Because such credibility determinations are "virtually unreviewable," *Briley*, 236 F.3d at 1377, we decline to question the AJ's credibility conclusions here.

The notarized signature on the waiver form, the Fraud Department's assessment that the waiver form signature matched Mrs. Metz's signature, and the contemporaneous March 1988 letter all support the AJ's conclusion that Mrs. Metz's signature on the waiver form was not forged. Thus, we disagree with Mrs. Metz's proposition that "the AJ substituted his feelings for evidence." *See* Appellant's Br. 35–37.

Mrs. Metz appears to agree that the AJ based at least part of his findings on credibility determinations but argues that we should "overturn a credibility finding if there are 'sufficiently sound' reasons for doing so." Appellant's Br. 36 (citing *Haebe v. DOJ*, 288 F.3d 1288, 1301 (Fed. Cir. 2002)). While the general rule is that credibility determinations are "virtually unreviewable," we may do so in certain circumstances such as when a credibility determination is contrary to undisputed facts. *See Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1149 (Fed. Cir. 1997). But the facts here are not undisputed—the factual dispute is the heart of the matter before us. *See* Appellant's Br. 40 ("[T]he question before the AJ was whether Cheryl's signature on the waiver form was genuine or forged.").

As to Mrs. Metz's purported evidence, the AJ reviewed Ms. Eisenberg's testimony that she had a "strong opinion" that Mrs. Metz "probably" did not sign the waiver form. *See Decision*, at 10–12. As a preliminary point, the AJ was

faced with OPM's Fraud Department's conclusion that Mrs. Metz's signatures were a "match" *and* Ms. Eisenberg's opinion that Mrs. Metz "probably" did not sign the waiver. This evidence is obviously in conflict, and as we have stated previously, "[i]f the evidence in record will support several reasonable but contradictory conclusions, we will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002).

Additionally, the AJ found that Ms. Eisenberg's opinion was "fundamentally flawed because she admittedly did not have substantial background information concerning [Mrs. Metz] that could have been critical in her examinations and conclusions." *Decision*, at 10–11. For example, Ms. Eisenberg testified that she often considers the medical condition of the alleged signor when assessing forgeries and that drug or alcohol use is "going to be a problem" in assessing signatures. *See* J.A. 366. She also agreed that someone's signature could change if they were standing up versus lying down. *See* J.A. 370–71. Yet, Ms. Eisenberg was unaware that Mrs. Metz, Dennis Metz, and Dr. Merikangas all testified that Mrs. Metz suffered from multiple medical conditions in 1988, including a condition that left her in a full body brace at one point such that she was bedridden, and was on a variety of prescription medications. In other words, Ms. Eisenberg had not considered how Mrs. Metz's physical condition and use of prescription drugs (which apparently was so extensive that Mrs. Metz relies on the use of these drugs to alternatively argue that she was mentally incompetent to sign the waiver at the relevant time) would affect her signature, despite admitting such things could affect a person's signature. The AJ thus questioned the reliability of Ms. Eisenberg's opinion based on her lack of knowledge of pertinent substantive information. *Decision*, at 12 ("A reliable handwriting analysis cannot be done in a vacuum so to speak, without serious

consideration of these types of material facts and circumstances.").

The AJ also found "[s]omewhat favorable evidence to support [Mrs. Metz's] forgery position was how she demonstrated Mr. Metz as a serial forger." *Id.* at 19 (describing two incidents involving Mr. Metz's possible forgery of Dennis Metz's signature). But in the end the AJ found the examples too ambiguous, tangential, and unsupported by physical evidence such that he afforded these examples "little to no value." *Id.* Given the lack of evidence and our substantial evidence review, we agree that circumstantial evidence that Mr. Metz may have forged Dennis Metz's signature at some point in the past has little bearing on whether the signature here was forged.

All that remains of Mrs. Metz's purported evidence is Mrs. Metz's and Dennis Metz's testimony that she did not sign the waiver and did not see the waiver form until 2021. But these statements stand in contrast to record evidence—i.e., the notarized signature on the waiver form, the Fraud Department's assessment that the waiver form signature matched Mrs. Metz's signature, and the contemporaneous March 1988 letter. Based on these facts, we conclude that substantial evidence supports the AJ's decision.

## II

Separate from her fraud argument, Mrs. Metz also argues in the alternative that even if she did sign the waiver form, she was mentally incompetent at the time and thus the signature is not valid. Based upon underlying credibility determinations, which again are "virtually unreviewable," *Briley*, 236 F.3d at 1377, and contradictory evidence in the record, the AJ concluded that Mrs. Metz had not met her burden to show that she was mentally incompetent to sign the waiver form in April 1988. *See Decision*, at 9 ("Generally, an appellant bears the burden to prove by preponderant evidence entitlement to the retirement benefit

she seeks." (citing *Cheeseman v. OPM*, 791 F.2d 138, 140–41 (Fed. Cir. 1986))).

It is undisputed that in April 1988, when the waiver form was signed, Mrs. Metz "suffered from a litany of medical conditions," including "debilitating back pain, recovery from spinal surgery, and a seizure disorder." *Id.* at 20–21. It is also undisputed that she was prescribed a variety of medications at the time, including Valium, Percocet, and Demerol. *See* Appellant's Br. 49; J.A. 218. "These medications often lead to side effects, such as sedation and grogginess." *Decision*, at 21. What is disputed is whether these medications led to Mrs. Metz's mental incompetence to sign the waiver form in April 1988. Mrs. Metz primarily relied on Dr. Merikangas's expert testimony, submitted in a two-page report, concluding "that to a reasonable degree of certainty Mrs. Metz was not competent to execute a contract in April of 1988." J.A. 218.

But the AJ found that Dr. Merikangas's testimony was problematic in a number of ways. First, while Dr. Merikangas stated that "in general, people who are taking narcotics for pain continue to take them," he also stated that patients "don't always take all the medication prescribed." J.A. 390. And when asked if Dr. Merikangas was aware of whether Mrs. Metz was taking her prescribed medication, Dr. Merikangas responded, "I have no way of knowing that, Your Honor." J.A. 389. Second, Dr. Merikangas concluded that Mrs. Metz should not enter into a contract specifically during "her time under the influence of Valium." J.A. 403–04 ("Q. Okay. Now, when you testified that she shouldn't enter into a contract, are you just referring to her time under the influence of Valium. Correct? A. Yes."). But while Dr. Merikangas repeatedly called Valium a "tranquilizer" that dulls the senses, e.g., J.A. 396, Dr. Merikangas also admitted, and it is undisputed, that Mrs. Metz had been taking Valium since she was 17 years old—i.e., for almost 30 years in 1988 when the waiver was signed. *See* J.A. 218; *see also* J.A. 400–01. Dr. Merikangas testified

that a patient "does build up tolerance" to prolonged uses of Valium that "could limit the side effects" of the drug. J.A. 401–02. Third, the AJ found that there was no evidence that Dr. Merikangas had spoken with Mrs. Metz to discuss these material questions regarding whether she took her medication as prescribed and what side effects she actually experienced. *Decision*, at 21–22. Indeed, Mrs. Metz's own testimony only proffered that she was "in rough shape" at the time—a vague testimony that the AJ found "did not shed light on her specific mental capacity on April 9, 1988." *Id.* at 23; *see also* J.A. 415.

In addition to what the AJ characterized as Dr. Merikangas "sparse and insufficient analysis," *Decision*, at 21, even more problematic was that other purported evidence appeared to contradict Dr. Merikangas's testimony that Mrs. Metz could not enter into a contract at the relevant time. This led the AJ to question the credibility of Dr. Merikangas's testimony. *See id.* at 7 ("[P]arts of Ms. Eisenberg's testimony and opinions ran directly counter to that of . . . Dr. Merikangas . . . . This meant I had to discredit one expert to a degree to find the other one credible or find both not persuasive. The evidence led me to the latter."). For example, Dr. Merikangas testified that Valium would have a similar effect as being intoxicated with alcohol, J.A. 392, and Ms. Eisenberg testified that "drugs or alcohol" would "be a problem" when assessing signatures, J.A. 366. But Ms. Eisenberg testified that she "didn't see any evidence" of a medical condition or medication use in the signatures she analyzed. *See* J.A. 367; *see also* J.A. 369 ("None of those features that are typically found in an impaired person are evident in these questioned signatures."). As another example, both Mrs. Metz and Dr. Merikangas relied on a June 27, 1988, medical report (written two and half months after the waiver document was signed) as evidence of Mrs. Metz's mental capacity in April when she signed the document. But the AJ found that nothing in this medical report actually

addressed Mrs. Metz's mental capacity in April 1988. *See Decision*, at 22–23; J.A. 251. Instead, the AJ found that the report made "general statements about the medical conditions that she was suffering since 1983." *Decision*, at 23. At best, the letter states that Mrs. Metz's "pain is a continual distraction and the pain medication dulls her sensorium to the point she is unable to read a book or do sedentary work." J.A. 251. Indeed, that same report characterized Mrs. Metz as "pleasant, positive in outlook, and interested in leading a normal life" and her "primary symptom has been pain: headache, nerve pain in shoulders and arms, low back pain." J.A. 251. As another example, the AJ was bothered by the contradiction that Mrs. Metz suggests that she was mentally competent at other points between 1987 and 1989, despite the fact that she was prescribed the same medications during this period as she was in 1988. *See Decision*, at 23; Appellant's Br. 49 ("[B]eginning in 1987 [Mrs. Metz] was regularly prescribed Valium, Roxicet/Percocet, and (beginning in November 1987) Demerol."); J.A. 247 (March 1987 letter listing pain medications as Demerol, Percocet, and Tylenol); J.A. 264–66 (August/September 1988 letter listing medications as Armour Thyroid, Valium, Inderol, Naprosyn, Macrodantin, Percocet, Demerol, and Phenergan). During this time, and while on these medications, the AJ pointed out (and Mrs. Metz does not dispute) that she had the mental capacity to write a letter to the Social Security Administration in August 1988. *See Decision*, at 22. And even Dr. Merikangas, when pressed, agreed that it was possible that at times during this period that Mrs. Metz did have the mental capacity to enter into a contract. *See id.*; J.A. 398–99.

All of these "contradictions without adequate explanations" led the AJ to find that "there were stretches of time in 1988 when the appellant possessed the mental capacity to bind herself to an agreement, making it even more necessary for her to show specifically how she did not have

such capacity on April 9, 1988." *Decision*, at 22. In other words, the AJ found that Mrs. Metz was mentally competent during at least some points in 1988, even if she was mentally incompetent during others. Given it was Mrs. Metz's burden to show by preponderant evidence that she was mentally incompetent when she signed the waiver, and the evidence showed that Mrs. Metz was at least sometimes mentally competent when prescribed Valium and the various pain medications, the AJ concluded that Mrs. Metz had not met her burden to show that she was mentally incompetent on April 9, 1988. Based on our review of this record, we conclude that the AJ's findings were supported by substantial evidence.

Our affirmance, however, should not be read to suggest that every case involving questions of mental incompetence requires an appellant to demonstrate mental incompetence on a particular day and time. In general, such a showing might be unnecessary and overly burdensome. This case, however, presented the unique fact pattern that led to unfavorable credibility determinations for most of Mrs. Metz's witnesses and included allegations riddled with contradictions. Those issues lead us to affirm the AJ's determination that Mrs. Metz did not meet her burden to show she was mentally incompetent when she signed the document in April 1988.

III

Mrs. Metz's final argument is that the AJ abused his discretion by drawing an adverse inference against the March 1988 letter. *See* Appellant's Br. 55–57. We disagree.

"If an abuse of discretion did occur with respect to the discovery and evidentiary rulings, in order for petitioner to prevail on these issues he must prove that the error caused substantial harm or prejudice to his rights which could have affected the outcome of the case." *Curtain v. OPM*, 846 F.2d 1373, 1379 (Fed. Cir. 1988). Mrs. Metz has not

shown such harm or prejudice here. Rather, despite the adverse inference, the AJ specifically stated that even if he had not sanctioned Mrs. Metz, he "still would have found based on the evidentiary record that she did not meet her burden to prove entitlement to a CSRS survivor annuity." *Decision*, at 5 n.5. Moreover, we see nothing in the record that suggests the AJ actually applied the adverse inference. In fact, he spent numerous pages in his decision analyzing both the March 1988 letter and Mrs. Metz's arguments against that letter. *See id.* at 16–19. Thus, any error here, to the extent one occurred, was harmless because it did not impact the AJ's ultimate conclusion.

#### CONCLUSION

We have considered Mrs. Metz's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm.

### **AFFIRMED**

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**CHERYL JEAN METZ,**
*Petitioner*

**v.**

**OFFICE OF PERSONNEL MANAGEMENT,**
*Respondent*

———————————

2023-1873

———————————

Petition for review of the Merit Systems Protection MSPB in No. DC-0831-22-0046-I-2.

———————————

DYK, *Circuit Judge*, dissenting-in-part.

I join Part I and Part III of the Discussion section of the majority opinion but respectfully dissent from Part II and the result.

This case involves an application by the petitioner Mrs. Cheryl Metz for a survivor annuity pursuant to 5 U.S.C. § 8341(b)(1). Mrs. Metz applied for the annuity after her husband's death in 2006. The Office of Personnel Management ("OPM") apparently lost the application and did not act on it for fifteen years. In 2021, Mrs. Metz appealed to the Merit Systems Protection Board ("MSPB"), asserting that she was entitled to survivor annuity

benefits. The MSPB ordered OPM to issue its decision, and OPM denied the application because in a document dated April 9, 1988, Mrs. Metz waived her right to survivor annuity benefits pursuant to 5 U.S.C. § 8432(b)(1).

Mrs. Metz appealed the denial of benefits to the MSPB, arguing that she was incompetent at the time of signing.[1] A waiver is not binding if the annuitant was not competent when she signed the form. *Braza v. Off. of Pers. Mgmt.*, 598 F.3d 1315, 1319 (Fed. Cir. 2010) (en banc). In cases involving an alleged waiver of survivor annuity benefits, the claimant bears the burden of proving that there was no waiver of the survivor annuity by a preponderance of evidence. *Cheeseman v. Off. of Pers. Mgmt.*, 791 F.2d 138, 140–41 (Fed. Cir. 1986); *O'Neill v. Off. of Pers. Mgmt.*, 76 F.3d 363, 365 (Fed. Cir. 1996). As the majority acknowledges, *see* Majority Op. 13, there are few facts in dispute— all parties agree that at the time Mrs. Metz signed the waiver she was in debilitating back pain; that Mrs. Metz was prescribed Valium, Percocet, and Demerol; and that "the combination of these medications . . . would interfere with her capacity to understand and to reason." J.A. 389.[2]

However, the MSPB concluded that Mrs. Metz's waiver was valid, finding that the evidence that she was incompetent on the day she signed the waiver was "too general" and that Mrs. Metz and her medical expert Dr. Merikangas had

---

[1]    Mrs. Metz also argued that her husband had forged her signature on the waiver. I agree with the majority's conclusion that the MSPB's decision rejecting this argument is supported by substantial evidence.

[2]    Mrs. Metz had apparently been taking Valium for quite some time, which could have led to her developing tolerance for the drug. There is no suggestion in the record, however, that the drug cocktail she was taking at the time she signed the waiver did not have adverse effects.

failed to "prove[] she was mentally incompetent on April 9, 1988," the date the waiver was signed. J.A. 23. The MSPB based its conclusion on three specific findings. I think the MSPB's three findings are not supported by substantial evidence.

I

First, the MSPB found that Mrs. Metz failed to demonstrate that she took the medication on April 9, 1988 (the date she signed the waiver), based on an exchange between the MSPB and Dr. Merikangas:

> Judge DiTomasso: Dr. Merikangas, are you aware if Ms. Metz was actually taking any of this medication?

> The Witness: I have no way of knowing that, Your Honor.

J.A. 389.

It seems self-evident that a medical witness who was not treating Mrs. Metz thirty years ago cannot provide direct evidence that she was taking medication on a specific April day in 1988. Mrs. Metz's prescription records showed consistent refills of Valium and Percocet on a near-monthly basis for more than two years before she signed the waiver. *See* J.A. 229–39. Dr. Merikangas testified without contradiction that, although patients "don't always take all the medication[s] prescribed," "the doctor prescribing this believed that she was taking her medication. And, in general, people who are taking narcotics for pain continue to take them." J.A. 390. This is uncontradicted circumstantial evidence that Mrs. Metz was likely taking the prescribed medications.

The MSPB totally disregarded Mrs. Metz's own testimony that she was regularly taking the prescribed medication in April 1988. Mrs. Metz answered in the affirmative when asked "were you taking the medications

Dr. Merikangas discussed in April 1988?" and testified that the impact of taking the combination of Valium, Percocet, and Demerol was that she "d[idn't] remember much in those days other than being in [her] room, with the blinds and everything closed." J.A. 418–19. She further testified that she "was in a full body brace," such that the "only place [she] could go was maybe on the couch . . . for a very short period, five to ten minutes." J.A. 419.

There was no evidence in the record at all to find that Mrs. Metz did not take her prescribed medications on April 9, 1988. The undisputed record taken as a whole confirms that it is virtually certain that Mrs. Metz was heavily medicated at the time that she signed the waiver.

## II

Second, the MSPB found that even if Mrs. Metz did take the medication on April 9, 1988, her supposed lucidity at other times that year showed that she was not necessarily medically incompetent on the date in question. The MSPB gave great weight to the fact that Mrs. Metz signed a letter related to her physical limitations that was dated August 4, 1998, to a Social Security Administration Administrative Law Judge presiding over Mrs. Metz's disability appeal. The fact that she signed the August 1998 letter does not compel the finding that she composed it, and the MSPB made no factual finding to that effect here. There was also in the record a letter from a physician treating Mrs. Metz dated June 27, 1988, which specifically stated that the combination of Mrs. Metz's debilitating pain and medication regimen "dull[ed] her sensorium to the point she was unable to even read a book." J.A. 387. The MSPB dismissed this, too, solely on the ground that the letter was dated two months after she signed the waiver.

The MSPB also found that some of Mrs. Metz's testimony contradicted her claim that she was incompetent since she testified in detail and with clarity concerning

things that occurred at various times in the 1980s. The MSPB did not cite to any portion of Mrs. Metz's testimony for this proposition, and proof of incompetence to sign a waiver does not require a showing that she had no recollection of the past.

### III

Third, the MSPB improperly relied on supposed inconsistencies in the testimony of handwriting expert Ms. Eisenberg and Dr. Merikangas, concluding that "the competing nature of [Mrs. Metz's] two expert witnesses' testimony and opinions is even more of a reason . . . to not value much of either." J.A. 25. The MSPB used the testimony of Ms. Eisenberg—an individual with no medical training who was called to testify solely as to handwriting analysis—as reason to discredit Dr. Merikangas's medical opinion. The MSPB found that Dr. Merikangas's opinion that Mrs. Metz was medically incompetent was contradicted by Ms. Eisenberg's testimony "that her review of [Mrs. Metz's] known signatures from 1986 and beyond did not indicate that they were from an 'infirmed' person" and that "there was no evidence from [her] known signatures of a medical condition or impairment." J.A. 25.

The fact that Ms. Eisenberg was not able to determine whether Mrs. Metz was medically incapacitated based on Mrs. Metz's handwriting hardly shows that she was medically competent. Ms. Eisenberg was simply not qualified to give an expert opinion on this issue. The MSPB improperly discounted Dr. Merikangas's medical testimony.

\* \* \*

In light of the MSPB's errors, I would vacate and remand. I thus respectfully dissent-in-part as to the majority opinion concerning medical incompetence.